[Cite as *Imperial Aviation Servs., L.L.C. v. Ohio State Univ.*, 2024-Ohio-3200.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Imperial Aviation Services LLC et al., | : | |
| Plaintiffs-Appellants, | : | |
| v. | : | No. 23AP-751<br>(Ct. of Cl. No. 2022-00761JD) |
| Ohio State University, Columbus<br>c/o Ohio State University Airport, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |
| | : | |

---

D E C I S I O N

Rendered on August 22, 2024

---

**On brief:** *Michael T. Conway and Company*, and *Michael T. Conway*, for appellants. **Argued:** *Michael T. Conway*.

**On brief:** *Dave Yost*, Attorney General, *Peter E. DeMarco*, and *Jeanna V. Jacobus*, for appellee. **Argued:** *Jeanna V. Jacobus*.

---

APPEAL from the Court of Claims of Ohio

LUPER SCHUSTER, J.

{¶ 1} Plaintiffs-appellants, Imperial Aviation Services LLC ("Imperial Aviation") and Carlos L. Muller, appeal from a judgment of the Court of Claims of Ohio granting the summary judgment motion of defendant-appellee, Ohio State University ("OSU"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} Imperial Aviation provides aircraft cleaning and detailing services. This business is owned and operated by Muller, a graduate of the aviation management program of the OSU Center for Aviation Studies. In 2019, Imperial Aviation began to operate as a

vendor at the airport owned and operated by OSU (hereinafter "OSU Airport"), cleaning and detailing OSU's flight school planes. A vendor, which may or may not have a formal agreement with OSU, is a business that provides commercial services to OSU but not to third parties on the OSU Airport grounds.

{¶ 3} In January 2020, the OSU Airport posted information on social media, including Facebook and Instagram, regarding services provided at the OSU Airport. These postings included a reference to Imperial Aviation and an image of Muller cleaning an airplane.

{¶ 4} On June 29, 2020, Imperial Aviation and OSU entered a one-year lease agreement giving Imperial Aviation, as a tenant, designated rental space in an OSU Airport airplane hangar "solely for office purposes in support of aircraft operations." (Def.'s Ex. G at 1.) The lease enabled Imperial Aviation to store materials onsite, but it prohibited Imperial Aviation from conducting "commercial activity of any kind from, in, or around the Leased Property or on Airport property." (Def.'s Ex. G at 1.) The lease also expressly noted that Imperial Aviation's use of the premises must comply with all law, including the rules and regulations governing the OSU Airport, Ohio Adm.Code 3335-105-01 through 3335-105-11. Thus, under this arrangement, Imperial Aviation's use of the OSU Airport was limited to cleaning and detailing OSU's flight school planes and using the leased hangar area to store equipment in support of that work.

{¶ 5} To expand Imperial Aviation's operations at the OSU Airport, the parties entered into a commercial service agreement on December 15, 2020. This agreement commenced on that date and had a termination date of June 30, 2021. Under this agreement, OSU granted permission to Imperial Aviation, as an independent contractor, to perform aircraft cleaning and detailing services to third parties at the OSU Airport. This agreement expressly prohibited Imperial Aviation from advertising any connection with OSU or using, without permission, OSU's intellectual property to promote its business. Like the lease, the commercial service agreement expressly required Imperial Aviation's compliance with all applicable law, including the rules and regulations applying to the OSU Airport. Neither the lease nor the commercial service agreement includes an automatic right to renewal.

{¶ 6} Muller and Imperial Aviation were also involved with OSU as a project sponsor at OSU's Center for Aviation Studies. Holly Henley, a communications specialist for the OSU Airport, wrote two news articles about student capstone projects that included information about Muller and Imperial Aviation. These projects are part of an upper-level course students take at OSU's Center for Aviation Studies. The first article, published in December 2020, discussed how a former student, Muller, and his business, Imperial Aviation, sponsored and otherwise supported a capstone project in the fall 2020 semester. The article explained the student research project centered on using an OSU College of Engineering wind tunnel to test whether a certain ceramic coating improved aircraft fuel efficiency. Muller served as a mentor to the students in their project. The second article, published in May 2021, discussed multiple capstone projects at OSU's Center for Aviation Studies, including a marketing strategy project sponsored by Imperial Aviation. The article explains how the capstone projects at OSU's Center for Aviation Studies provide students with practical learning because the students are able to train with, and learn from, industry sponsors. Muller is quoted in the article describing the importance of alumni staying connected with the program and giving back to help current students.

{¶ 7} On March 22, 2021, prior to the publishing of the May 2021 article, Muller and Imperial Aviation employees were at the OSU Airport detailing a Gulfstream airplane owned by ExcelAire. At approximately 8:00 p.m. that day, and without OSU Airport management approval, Muller used the credentials issued to Imperial Aviation to allow five individuals and four vehicles associated with a third-party business, 7th Gear Exotics, to gain access to an OSU Airport hangar through a secured gate, for the purpose of taking photographs and videos to be used in advertising and business promotion. Muller was seeking to expand his business by collaborating with 7th Gear Exotics to provide high-end vehicle rentals to third-party clients at the OSU Airport. Adam Wolf, the OSU Airport Manager, learned of this activity, and he directed Muller to have this unauthorized group immediately leave the premises.

{¶ 8} The next day, Wolf notified Muller that Imperial Aviation's access to the OSU Airport was suspended, and he initiated an investigation into the matter. Wolf learned this was not the first time Muller had, without approval, given 7th Gear Exotics access to the premises for business development and advertising. As part of the investigation, Muller

emailed a statement to Wolf regarding the March 22, 2021 occurrence. Muller explained that he was contacted in the fall of 2020 by the owner of 7th Gear Exotics, who was seeking to expand his exotic car rental business to include clients at airports. To this end, the 7th Gear Exotics owner sought access to the OSU Airport to take photographs of their vehicles near one or more airplanes. Muller admitted that, in addition to the March 2021 occurrence, in the fall of 2020, he provided unauthorized access to a restricted area because he wanted to further the business collaboration between Imperial Aviation and 7th Gear Exotics. Muller expressed regret for not obtaining OSU Airport management approval prior to this conduct. At his deposition, Muller acknowledged that he and 7th Gear Exotics were on the OSU Airport premises on October 22, 2020, for the sole purpose of creating video and photographic content for advertising. The owner of 7th Gear Exotics paid $850 to Imperial Aviation for this access. Muller viewed this content as beneficial to the marketing of both 7th Gear Exotics and Imperial Aviation, and this content was used in social media to promote these businesses.

{¶ 9} After completing his investigation into the matter, on March 29, 2021, Wolf notified Imperial Aviation that its access to the OSU Airport was permanently suspended. Then, on July 12, 2021, Wolf informed Imperial Aviation that neither the lease nor the commercial service agreement would be renewed.

{¶ 10} On October 31, 2022, Imperial Aviation and Muller sued OSU for race discrimination, invasion of privacy by appropriation of image and likeness, interference with contract, and breach of contract. OSU moved for dismissal of the race discrimination and invasion of privacy claims. The Court of Claims granted this motion in part and denied it in part, and it indicated the following claims remained pending: Muller's statutory and common law invasion of privacy claims, Imperial Aviation's breach of contract claim, and Imperial Aviation's interference with contract claim.

{¶ 11} In August 2023, OSU filed separate summary judgment motions as to Imperial Aviation and Muller's remaining claims. In its summary judgment briefing, Imperial Aviation opposed OSU's motion as to its breach of contract claim, but not as to the interference with contract claim. And in his summary judgment briefing, Muller opposed OSU's motion as to his invasion of privacy claim, and he clarified this action was based on common law, not statute. In November 2023, the Court of Claims granted OSU's motions.

{¶ 12} Imperial Aviation and Muller timely appeal.

## II. Assignments of Error

{¶ 13} Imperial Aviation and Muller assign the following eight assignments of error for our review:

[I.] The trial court erred to the prejudice of the plaintiff-appellant Imperial Aviation Services when it dismissed the plaintiff's claim for breach of contract finding that the appellant does not dispute it violated contract terms in a lease with the appellee OSU given there is no evidence the appellant admitted it breached a lease or contract with appellee.

[II.] The trial court erred to the prejudice of the plaintiff-appellant Imperial Aviation Services when it dismissed the plaintiff's claim for breach of contract finding that the appellant violated contract terms by engaging in commercial activity in violation of a lease with appellee OSU when in fact appellant engaging in commerce at the OSU Airport was the entire purpose for both parties entering into the contact.

[III.] The trial court erred to the prejudice of the plaintiff-appellant Imperial Aviation Services when it dismissed the plaintiff's claim for breach of contract finding that the appellee OSU had a legal excuse [for not performing its contract obligations owed to the appellant by suspending appellant's access to OSU Airport and not renewing its contract with the appellant] when in fact the appellee's agent admitted it had no evidence the appellant breached a single term of any lease or contract.

[IV.] The trial court erred to the prejudice of the plaintiff-appellant Carlos Muller when it dismissed the plaintiff's claim for invasion of privacy finding the appellant "concedes" he is not pursuing an Ohio RC 2741.02 action when that action was never plead in the complaint.

[V.] The trial court erred to the prejudice of the plaintiff-appellant Carlos Muller when it dismissed the plaintiff's claim for invasion of privacy when it used his persona and name finding the appellant gave his consent to the appellee OSU to do so when in fact the appellant noticed the appellee he withdrew his consent.

[VI.] The trial court erred to the prejudice of the plaintiff-appellant Carlos Muller when it dismissed the plaintiff's claim for invasion of privacy when it used his persona and name after he withdrew his consent finding the appellant cannot withdraw his consent [meaning the appellee OSU may continue to use his persona and name for the rest of time without his consent].

[VII.] The trial court erred to the prejudice of the plaintiff-appellant Carlos Muller when it dismissed the plaintiff's claim for invasion of privacy when appellee OSU used his persona and name without his consent and the court claimed the cause of action sounded in breach of contract and not tort [because the appellant was angry the appellee did not renew a lease agreement with him?].

[VIII.] The trial court erred to the prejudice of the plaintiff-appellant Carlos Muller when it dismissed the plaintiff's claim for invasion of privacy when appellee OSU used his persona and name without his consent and the court claimed the invasion of privacy by the appellee was only incidental [and not commercial] hence no actionable.

(Sic passim.)

### III. Summary Judgment Standard of Review

{¶ 14} Muller and Imperial Aviation appeal from the Court of Claim's granting of summary judgment in favor of OSU. "An appellate court reviews summary judgment under a de novo standard." *Estate of Sample v. Xenos Christian Fellowship*, *Inc.*, 10th Dist. No. 20AP-563, 2021-Ohio-3898, ¶ 9. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). The court reviewing the motion only may consider "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action." Civ.R. 56(C).

{¶ 15} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the non-moving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the non-moving party has no evidence to support the non-moving party's claims. *Id.*; *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997). Once the moving party discharges its initial burden, summary judgment is appropriate if the non-moving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. *Dresher* at 293; *Vahila* at 430; Civ.R. 56(E).

## IV. Discussion

### A. Breach of Contract Claim

{¶ 16} Muller and Imperial Aviation's first, second, and third assignments of error challenge the Court of Claims' disposition of Imperial Aviation's breach of contract claim against OSU. The court concluded that OSU had a legal excuse to suspend Imperial Aviation's access to the airport, and, therefore, Imperial Aviation's breach of contract claim failed. Consequently, the court granted summary judgment in favor of OSU as to this claim. Muller and Imperial Aviation argue the court erred in finding Imperial Aviation admitted to breaching its contracts with OSU (first assignment of error), that Imperial Aviation engaged in commercial activity in violation of its contracts with OSU (second assignment of error), and that OSU had a legal excuse not to perform under the contracts (third assignment of error). These assignments of error are not well-taken.

{¶ 17} To succeed on a claim of breach of contract, a plaintiff must demonstrate: (1) the existence of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages or loss to the plaintiff. *Victoria's Secret Stores, L.L.C. v. Cintas Corp. No. 2*, 10th Dist. No. 21AP-97, 2021-Ohio-4327, ¶ 19. " '[B]reach,' as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the

doing of something inconsistent with its existence." *Natl. City Bank of Cleveland v. Erskine & Sons, Inc.*, 158 Ohio St. 450 (1953), paragraph one of the syllabus.

{¶ 18} The construction and interpretation of written contracts involve questions of law that this court reviews de novo. *McKeny v. Ohio Univ.*, 10th Dist. No. 17AP-392, 2017-Ohio-8589, ¶ 19, citing *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus. The purpose of contract construction is to realize and give effect to the intent of the parties. *Id.*, citing *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus. "[T]he intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992). "[W]hen 'the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.' " *Holdeman v. Epperson*, 111 Ohio St.3d 551, 2006-Ohio-6209, ¶ 12, quoting *Shifrin* at 638.

{¶ 19} At issue here is whether Imperial Aviation breached its contracts with OSU, excusing OSU from any further performance under the contracts. Imperial Aviation and Muller argue Imperial Aviation has not admitted to breaching its contracts with OSU. While it is correct they have not directly admitted to Imperial Aviation breaching its contracts with OSU, they have admitted to facts demonstrating that breach. Muller, as the owner and operator of Imperial Aviation, twice permitted unauthorized individuals and vehicles, with 7th Gear Exotics, into a secure area of the OSU Airport for the purposes of creating advertising content and developing Imperial Aviation's business collaboration with 7th Gear Exotics. Imperial Aviation reasons that this conduct was permissible under the terms of the contracts because it necessarily had discretion in how to advertise its services performed at the OSU Airport, and the decision to bring in exotic cars to the airport to help showcase its airplane cleaning business was within that discretion. We disagree.

{¶ 20} Although the contracts did not preclude Imperial Aviation from advertising its services, the contracts also did not give Imperial Aviation full authority to use the OSU Airport premises as it deemed appropriate to create advertising content. That is, any conduct relating to advertising or business development needed to fit within Imperial Aviation's obligations under those contracts. The lease granted Imperial Aviation a rental space in an OSU Airport hanger for the purpose of supporting its cleaning of OSU's flight

school planes. And the commercial services agreement expanded Imperial Aviation's role at the OSU Airport, permitting it to perform aircraft cleaning and detailing services to third parties at the OSU Airport. These contracts do not, however, contain any language authorizing Imperial Aviation to grant a third-party exotic vehicle rental company access to secure areas of the OSU Airport for the purpose of advertising or business development.

{¶ 21} Imperial Aviation's conduct violated the express terms of the contracts. The lease and commercial services agreement incorporated into their terms the rules and regulations of the OSU Airport, Ohio Adm.Code 3335-105-01 through 3335-105-11. As pertinent here, Ohio Adm.Code 3335-105-02(D) states: "Without the approval of the airport manager, no person shall offer services for hire, offer products for sale, conduct commercial activity or solicit for any purpose on the airport premises." Further, Ohio Adm.Code 3335-105-02(N) states: "Special events or demonstrations may be permitted on the airport only with the approval of the airport manager." When there is an "apparent violation of [these] rules," Ohio Adm.Code 3335-105-02(W) authorizes the OSU Airport manager to "take whatever action determined to be appropriate in order to enforce these rules."

{¶ 22} As discussed above, it is undisputed Imperial Aviation twice provided 7th Gear Exotics unauthorized access to a secure area of the OSU Airport. Muller enabled individuals from 7th Gear Exotics to drive their vehicles into an OSU Airport hangar for the purpose of taking business promoting photographs and videos near privately owned airplanes. This reasonably could be considered an unauthorized "special event," prohibited under Ohio Adm.Code 3335-105-02(N), as there was no evidence that the hangar normally serves as the backdrop for collaborating businesses to create advertising content. And even if it was not a "special event," as that term is used in the rule, Ohio Adm.Code 3335-105-02(D) required Imperial Aviation to obtain OSU Airport management preapproval for commercial activity on the premises. Imperial Aviation's conduct was commercial activity because it was producing content for advertising and collaborating with another business. But this type of commercial activity was not approved by airport management. The commercial service agreement granted Imperial Aviation "permission to perform aircraft cleaning and detailing at the [OSU Airport]." (Def.'s Ex. I at 1.) The authority provided to Imperial Aviation did not include permission to provide access to an OSU Airport hangar

by 7th Gear Exotics for advertising and business collaboration. Thus, Imperial Aviation violated its contracts with OSU by not first obtaining OSU Airport management approval for this activity. Consequently, OSU did not breach its contracts with Imperial Aviation by suspending Imperial Aviation's access to the OSU Airport.

{¶ 23} Because the Court of Claims properly granted summary judgment in OSU's favor as to Imperial Aviation's breach of contract claim, Imperial Aviation and Muller's first, second, and third assignments of error are overruled.

### B. Invasion of Privacy Claim

{¶ 24} Imperial Aviation and Muller's fourth, fifth, sixth, seventh, and eighth assignments of error concern the Court of Claims' disposition of Muller's invasion of privacy claim against OSU. They argue the court erred in finding that Muller conceded he is not pursuing an R.C. 2741.02 invasion of privacy claim (fourth assignment of error), that Muller consented to the use of his name and likeness (fifth assignment of error), that Muller could not withdraw his consent (sixth assignment of error), that Muller's claim sounded in contract not tort law (seventh assignment of error), and that OSU's use of Muller's name and likeness were merely incidental and not actionable (eighth assignment of error). These assignments of error either lack merit or are rendered moot.

{¶ 25} We first address Imperial Aviation and Muller's fourth assignment of error, which alleges the Court of Claims erred in finding that Muller was no longer pursuing an R.C. 2741.02 invasion of privacy claim. Muller asserts he did not plead a statutory invasion of privacy claim. Muller therefore reasons that the court's finding that he was no longer pursuing a statutory invasion of privacy claim erroneously assumes he initially brought that claim. Even assuming Muller did not plead a statutory invasion of privacy claim, he cannot show any prejudice resulting from the court finding he was not pursuing this claim at the summary judgment stage. Either way, no statutory invasion of privacy claim existed or remained after the court's summary judgment decision. Thus, Imperial Aviation and Muller's fourth assignment of error is overruled.

{¶ 26} Imperial Aviation and Muller's fifth, sixth, seventh, and eighth assignments of error challenge the Court of Claims' disposition of Muller's common law invasion of privacy claim. At common law, invasion of privacy includes four separate torts: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs, (2) public

disclosure of embarrassing private facts about the plaintiff, (3) publicity which places the plaintiff in a false light in the public eye, and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. *James v. Bob Ross Buick, Inc.*, 167 Ohio App.3d 338, 2006-Ohio-2638, ¶ 12 (2nd Dist.).

{¶ 27} Here, Muller alleged OSU appropriated his name or likeness for its own benefit. The Court of Claims found Muller consented to the use of his name and likeness, that OSU did not use his name or likeness outside the scope of his consent, that Muller could not legally withdraw his consent under the circumstances, and that, even if that consent was withdrawn, OSU's use of Muller's name and likeness were merely incidental and not actionable. Based on these findings, the Court of Claims awarded OSU summary judgment as to Muller's invasion of privacy claim. Imperial Aviation and Muller's fifth, sixth, and seventh assignments of error challenge the court's findings as to Muller's consent and possible withdrawal of that consent. These assignments of error become moot, however, based on our disposition of their eighth assignment of error, which challenges the Court of Claims' finding that any usage was incidental and not actionable.

{¶ 28} We agree with the Court of Claims' conclusion that, regardless of whether consent was given or withdrawn, the alleged appropriation was incidental and not actionable. Appropriation is not actionable if there is "mere incidental use of a person's name and likeness." *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 230 (1976), *rev'd on other grounds*, 433 U.S. 562 (1977). As explained in Restatement of the Law 2d, Torts, Section 652C (1965):

> The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.

*See Harvey v. Sys. Effect, L.L.C.*, 2d Dist. No. 28497, 2020-Ohio-1642, ¶ 58 (discussing Ohio court approval of this statement of law). This means "one's name and appearance, in and of themselves, are not private and, therefore, may be brought before the public." *Bosley v. WildWetT.com*, 310 F.Supp.2d 914, 920 (N.D.Ohio 2004).

{¶ 29} Here, the Court of Claims found that Muller's likeness on OSU social media posts was incidental to his role as owner and operator of Imperial Aviation, and that his name and likeness in the capstone news articles was incidental to his involvement in the capstone program. Imperial Aviation and Muller argue the court, in effect, found that Muller's name and likeness was used to advertise services OSU Airport tenants provide, thus promoting OSU's commercial success. Imperial Aviation and Muller argue this case parallels *Bosley*, which involved a plaintiff suing defendants for using, for their own advantage, images and videos of her engaging in a wet t-shirt contest. We are unpersuaded.

{¶ 30} Unlike in *Bosley*, OSU was not appropriating, for its own advantage, any commercial or other value associated with Muller's identity or personal qualities. No reasonable person could find that the usage of Muller's likeness, as a person cleaning an airplane, on OSU social media posts was more than incidental to the informational purpose of those posts. Similarly, OSU's use of Muller's name or likeness in its articles about Center for Aviation Studies capstone projects was not actionable. The articles identify Imperial Aviation, and its owner Muller, as one of multiple sponsors of capstone projects, and the articles also detail the collaboration between OSU's Center for Aviation Studies and other entities, or alumni, to further both the aviation industry and student development. The references to Muller and Imperial Aviation in these articles reasonably only can be considered incidental to the purpose of publishing information about the capstone program.

{¶ 31} In sum, there was simply no evidence to support a conclusion that OSU appropriated any commercial or other value associated with Muller's name or likeness for its own benefit. Therefore, we find the Court of Claims properly concluded Muller's invasion of privacy claim fails as a matter of law.

{¶ 32} Accordingly, we overrule Imperial Aviation and Muller's eighth assignment of error. This disposition renders as moot their fifth, sixth, and seventh assignments of error.

## V. Disposition

{¶ **33**} Having overruled Imperial Aviation and Muller's first, second, third, fourth, and eighth assignments of error, and finding as moot their fifth, sixth, and seventh assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

BOGGS and EDELSTEIN, JJ., concur.

_____